**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JERRY GIBSON, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:05-cv-1396 (JCH) |
| STATE OF CONNECTICUT JUDICIAL DEP'T | : | |
| COURT SUPPORT SERVICES DIVISION, | : | |
| JULIA O'LEARY, JOHN R. ROORBACH, | : | April 25, 2007 |
| and WILLIAM CARBONE, | : | |
| Defendants. | : | |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**AND MOTION TO STRIKE [Doc. Nos. 43 & 54]**

The plaintiff, Jerry Gibson, brings this action against the State of Connecticut

Judicial Department, Court Support Services Division ("CSSD"), as well as Julia

O'Leary, John R. Roorbach, and William Carbone, in their individual capacities. In his

Amended Complaint [Doc. No. 24], Gibson alleges race-based discrimination,

harassment, and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§

2000e, et seq., and sections 1981 and 1983 of Title 42 of the United States Code.

Gibson also asserts a claim of intentional infliction of emotional distress.

The defendants have filed a Motion for Summary Judgment [Doc. No. 43]

pursuant to Rule 56 of the Federal Rules of Civil Procedure. They have also filed a

Motion to Strike some of the plaintiff's evidence [Doc. No. 54].

**I.     STANDARD OF REVIEW**

In a motion for summary judgment, the burden is on the moving party to

establish that there are no genuine issues of material fact in dispute and that it is

entitled to judgement as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## II.    FACTS[1]

Gibson is an African-American male who began working for the State of Connecticut as a Juvenile Probation Aide on May 28, 1993.  See Def.'s Loc.R.Civ.P. 56(a)1 Statement ("Def.'s Stat.") at ¶ 1 [Doc. No. 43].  After a series of promotions, Gibson was appointed to Juvenile Matters Supervisor I on January 11, 2002.  Id. at ¶ 4. Karen Eaddy, as Juvenile Matters Supervisor II, was Gibson's immediate supervisor.

---

[1]For the purposes of the instant motion, the court accepts as true facts undisputed by the parties and resolves disputed facts in favor of Gibson where he provides evidence to support his allegations.

Id. at ¶ 5.  Regional Manager Randy Roorbach was the next supervisor in the chain of command, and he reported directly to Julia O'Leary, Deputy Director, Juvenile Probation.  Id. at ¶¶ 6-7.  O'Leary reported directly to Thomas White, who reported to William Carbone, Executive Director, CSSD.  Id. at ¶ 8.

Gibson and Eaddy were co-workers until July 2002, when Eaddy was promoted to Juvenile Matters Supervisor II and became Gibson's direct supervisor.  Id. at ¶ 12.  Eaddy is an African-American female.  Id. at ¶ 13.  There appears to have been some tension between Gibson and Eaddy.  Id. at ¶ 14.  Gibson requested a transfer from New Haven to Waterbury on October 14, 2002, which was denied because CSSD did not maintain a transfer list and it is necessary to apply for an open position.  Id. at ¶¶ 15-16.  On March 20, 2003, Gibson reaffirmed his desire to transfer to Waterbury.  Id. at ¶ 17.  From May 29 until June 26, 2003, Gibson took a medical leave, which Roorbach states was because Gibson was suffering from "bleeding on the brain."  Id. at ¶¶ 18, 20.

On October 20, 2003, Eaddy complained to Roorbach in writing that Gibson had refused to select a topic to present at the September 26, 2003, supervisor's meeting, which she claimed was in violation of CSSD Policy 2.11 Section A(1).  Id. at ¶ 21.  On October 2, Roorbach had gone to speak to Gibson after Eaddy had complained to him, and informed him in writing on October 23 that he was in violation of a workplace policy and that a pre-disciplinary meeting was scheduled for November 3, 2003, although it ultimately took place in the middle of November.  Id. at ¶ 24, 26; Plf.'s Stat. at ¶ 26.  On October 30, Gibson's attorney, Lawrence Pellett, wrote a letter, attaching Gibson's affidavit, that indicated that Eaddy and Gibson had communication problems.  See

3

Def.'s Stat. at ¶ 25; Plf.'s Stat. at ¶ 25.

On November 17, 2003, Gibson wrote an email to Carbone regarding some of his concerns. Def.'s Stat. at ¶ 27; Plf.'s Stat. at ¶ 27. On November 19, O'Leary asked Gibson if he was interested in a voluntary temporary transfer to Bridgeport, which Gibson declined two days later. Def.'s Stat. at ¶¶ 28-29.

Prior to November 28, 2003, Eaddy told Carbone "that she felt intimidated by plaintiff and that she feared for her safety at work." Id. at ¶ 30. On November 28, Eaddy wrote to O'Leary alleging intimidating and confrontational behavior by Gibson and that she feared for her safety. Id. at ¶ 31. On that same day, Carbone placed Gibson on administrative leave with pay. Id. at ¶ 32. O'Leary informed Eaddy on December 2, 2003, that Gibson was placed on administrative leave pending an investigation because Eaddy's allegations appeared to fall within the Workplace Violence Policy. Id. at ¶ 33. Roorbach's memorialization of his October 2nd meeting with Gibson indicated that he was "increasingly alarmed" by Gibson's presentation and behavior.[2] Id. at ¶ 35, Ex. 11. As part of the pre-disciplinary hearing and subsequent investigation, Joel C. Riley, Manager of Human Resources & Investigations, characterized Gibson's alleged conduct as verbally and physically aggressive toward Roorbach and that Gibson also stared at Eaddy. Id. at ¶ 36. Eaddy informed Riley in writing on December 11 that she found Gibson's demeanor at the pre-disciplinary hearing to be "quite intimidating." Id. at ¶ 37.

On December 16, 2003, Gibson was informed of another investigatory meeting,

---

[2]According to Gibson, it was Roorbach who was engaging in threatening and intimidating behavior toward him. See Plf.'s Stat. at Ex. 1, Gibson Dep. at 22-23.

to be held on December 19, regarding possible violations of the Workplace Violence Policy. Id. at ¶ 38. This investigation concluded that there was not sufficient evidence of workplace violence to sustain any disciplinary recommendation. Id. at ¶ 39. On January 13, 2004, Eaddy informed Carbone in writing that she feared Gibson's return to work; on January 26, Gibson was summoned to a meeting, held on January 30, to discuss his return to work. Id. at ¶¶ 40-41. He was informed that he could return to work on February 13; however, he was required to provide documentation from a mental health care provider (a "fitness for duty" letter), as the CSSD investigation "revealed communication problems between [Gibson] and . . . Eaddy, as well as inappropriate, threatening behavior directed by [Gibson] towards Ms. Eaddy and Randy Roorbach." Id. at ¶¶ 42-44. Gibson was also given a "Letter of Counseling and Expectation."[3] Id. at ¶ 45.

On February 16, 2004, Michael Duques, LCSW, informed Riley that Gibson did not pose a threat to others. Id. at ¶ 46. On February 19, the investigation was concluded and found that the allegations regarding Gibson's violation of the Workplace Violence Policy were "unsubstantiated." Id. at ¶ 48. On February 23, Gibson returned to work at the New Haven Juvenile Probation Office. Id. at ¶ 50. Upon his return, Gibson's workplace responsibilities were changed by O'Leary to be more administrative in nature for a short time period of one or two weeks. Id. at ¶¶ 51-52; Plf.'s Stat. at ¶ 52. On February 24, Gibson requested a transfer to the New Britain Juvenile Court, which was granted effective June 25, 2004. Def.'s Stat. at ¶¶ 59-60.

_____

[3]Eaddy was sent to a training session on communication after the November pre-disciplinary hearing. See Plf.'s Stat. at Ex. 2, O'Leary Dep. at 74.

On March 1, 2004, the Connecticut Commission on Human Rights and

Opportunities ("CHRO") received a discrimination complaint filed by Gibson, which was

dated February 25. Id. at ¶ 54. On March 28, 2005, the CHRO notified the Judicial

Branch that Gibson sought to amend his original CHRO complaint to include an

allegation of retaliation. Id. at ¶ 61.

## III.    DISCUSSION

### A.    Title VII Claims[4] (Count One)

#### 1.    Disparate Treatment

Analyzing whether the defendants subjected Gibson to disparate treatment must

be done under the burden-shifting framework of McDonnell Douglas Corp. v. Green,

411 U.S. 792 (1973). See Fitzgerald v. Henderson, 251 F.3d 345, 356 (2d Cir. 2001).

The plaintiff is first required to establish a prima facie case of discrimination. See

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). A prima facie

case for disparate treatment is made out by showing that: (1) the plaintiff is a member

of a protected class; (2) the plaintiff performed his job adequately; (3) the plaintiff

suffered an adverse employment action; and (4) that the adverse employment action

occurred under conditions giving rise to an inference of discrimination. Burdine, 450

U.S. at 254.

Once a plaintiff has established a prima facie case, a rebuttable presumption of

discrimination arises, and the burden shifts to the defendant to offer a legitimate,

---

[4]Gibson's Title VII claims cannot be brought against William Carbone, Julia O'Leary, and Randy Roorbach in their individual capacities. Only employer-entities, and not individual supervisors, may be sued under Title VII. See Tomka v. Seiler Corp., 66 F.3d 1295, 1314 (2d Cir. 1995). Thus, summary judgment is granted as to these defendants on Gibson's Title VII claims.

non-discriminatory reason for its actions. <u>See</u> <u>id.</u> Upon the employer's articulation of a nondiscriminatory reason for the employment action, the presumption of discrimination that arises with the establishment of the prima facie case drops out. <u>See</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 510-11 (1993). The burden then shifts back to the plaintiff to fulfill his ultimate burden of proving that the defendants intentionally discriminated against him in the employment action. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000). In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination. <u>Id.</u>

A prima facie case combined with a showing that an employer's asserted justification is false is sometimes, but not always, sufficient to permit a discrimination claim to survive summary judgment. <u>Schnabel v. Abramson</u>, 232 F.3d 83, 89-91 (2d Cir. 2000) (citing <u>Reeves</u>, 530 U.S. at 142). The court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" <u>Schnabel</u>, 232 F.3d at 90 (quoting <u>Reeves</u>, 530 U.S. at 143). The plaintiff need not show that race was the only factor motivating any adverse employment actions he suffered in order to make a showing of employment discrimination. <u>See</u> 42 U.S.C. § 2000e-2(m); <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003). "The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason," regardless of whether the case is presented as one of single or dual motive. <u>Stratton v. Dep't for the Aging for New York</u>,

132 F.3d 869, 878 (2d Cir.1997).

The defendants assert that Gibson has failed to make out a prima facie case of discrimination. They claim that being placed on administrative leave and investigated for workplace violence, being given a Letter of Counseling and Expectation, being required to obtain a fitness of duty letter before returning to work, and having job duties altered for one or two weeks do not constitute adverse employment actions, and that none of these actions occurred under conditions giving rise to an inference of discrimination. Gibson acknowledges that the fact that he was placed on administrative leave pending an investigation does not by itself constitute the alleged adverse employment action in this case. Instead, he claims that it is the "circumstances leading up to and surrounding" this forced leave that do, including the following: (1) not being given notice of the charges against him when placed on administrative leave and being humiliatingly escorted from the building; (2) the length of investigation (three months); (3) having his job duties "mendaciously modified" upon his return to work as "essentially a form of probation"; and (4) being required to undergo a mental health evaluation and being given a Letter of Counseling and Expectation that indicated he would be "closely monitored." See Plf.'s Memorandum in Opposition ("Mem. in Opp.") at 17-21 [Doc. No. 52].

The Supreme Court recently pronounced that an adverse employment action in the context of a Title VII retaliation claim must be "materially adverse," in that it would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Sante Fe Railway Co. v. White, _ U.S. _, 126 S.Ct. 2405, 2415 (2006). Material adversity must be the focus in determining whether an adverse

employment action has occurred because "it is important to separate significant from trivial harms." White, 126 S.Ct. at 2415. Appearing entirely consistent with the Supreme Court's language in White, the Second Circuit defines an adverse employment action as a "materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." Fairbrother v. Morrison, 412 F.2d 39, 56 (2d Cir. 2005). Prototypical examples of adverse employment actions include termination; demotion via a reduced wage, salary, or job title; a material loss of benefits; or significantly reduced responsibilities.[5] Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (citation omitted). To show that such adverse actions took place under conditions giving rise to an inference of discrimination, a plaintiff may demonstrate that the defendant "treated him less favorably than a similarly situated employee outside his protected group." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). A plaintiff must specifically show himself to be "similarly situated in all material respects" to the individuals with whom he compares herself. Shumway v. United Parcel Serv. Inc., 118 F.3d 60, 64 (2d Cir. 1997).

The court will address each of Gibson's four alleged adverse employment actions separately.[6] Beginning with the fourth alleged adverse action – being required

---

[5]Two recent Second Circuit cases, Kessler v. Westchester County Dep't of Social Servs., 461 F.3d 199 (2d Cir. 2006), and Joseph v. Leavitt, 465 F.3d 87 (2d Cir. 2006), further address what actions constitute adverse employment actions under Title VII. Joseph held that "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action." 465 F.3d at 91.

[6]Gibson also claims he was escorted out of the building in a discriminatory manner; however, he has not produced any evidence that would support this claim. See Plf.'s Mem. in Opp. at 17-18.

to undergo a mental health evaluation and being given a Letter of Counseling and Expectation – the court finds that these do not constitute adverse employment actions under Title VII.  The Second Circuit has stated that "the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances."  Joseph, 465 F.3d at 91.  In this case, the court does not find that the defendants "exceeded those [reasonable disciplinary procedures] and thereby changed the terms and conditions of employment" by requiring Gibson to undergo a mental health evaluation upon returning to work. Id. at 93 n.1.  Although the investigation found the allegations of workplace violence to be unsubstantiated, the report nevertheless found that Gibson's behavior "has the effect and intent of being intimidating. . . . [It] is perceived by [Eaddy] as intimidating and his behavior is certainly inappropriate."  See Def.'s Stat. at Ex. 24, Investigation Background and Summary.  Thus, the court finds the requirement of a mental fitness evaluation is not materially adverse under the circumstances.

As for the claim that Gibson's job duties were temporarily altered to be more administrative in nature for a period of one or two weeks subsequent to the investigation, Gibson testified that as soon as he contacted the union about the change in job responsibilities, his job duties changed back.  See Plf.'s Stat. at Ex. 1, Gibson Dep. at 105-6.  According to O'Leary, she gave Gibson more administrative job duties because "part of the investigation had determined that Jerry was probably one of the best organized supervisors in the office," and so he would be "the best person to put in charge of" some administrative tasks.  See Def.'s Stat. at Ex. C, O'Leary Dep. at 114. However, she was subsequently instructed by Carbone to undo the change in duties

and reassign Gibson to his former duties, because "a better approach, since we were returning him to his place of previous employment, was to return him to that place with the same responsibilities."  See Plf.'s Stat. at Ex. 5, Carbone Dep. at 118.  Because Gibson's job duties were only altered for one to two weeks, at most, the court finds this temporary change was not an actionable adverse employment action.  There is no evidence that the change in duties resulted in a change in salary, title, or benefits, and "any adverse impact on [Gibson] was promptly addressed. . . . Thus, even if a transfer of this sort could be classified as an adverse employment action, it was too brief to be actionable."  Leget v. Henderson, 2001 U.S. Dist. LEXIS 284, at *18 (S.D.N.Y. 2001); c.f. Brady v. Wal-Mart Stores, Inc., 455 F. Supp. 2d 157,170-71 (E.D.N.Y. 2006) (discussing temporary actions, even if adverse, as not necessarily "legally cognizable harm" if temporary and restoration to former status).

        With respect to Gibson's claim that the investigation into allegations of violence took approximately three months, "a considerably longer period of time than was the practice at CSSD," see Plf.'s Mem. in Opp. at 18, even assuming that this is an adverse employment action, there is nothing in the record to suggest that the length of time was in any way influenced by discrimination.  Indeed, the defendants have articulated a legitimate explanation regarding this issue, for although Carbone testified at his deposition that his "preference" was to complete these investigations "as quickly as possible . . . with limited resources, sometimes that's just not possible and they take longer than I would like to see them take, including in this case."  See Plf.'s Stat. at Ex. 5, Carbone Dep. at 103.  The court finds the three-month time period not to be "exceptionally dilatory" under the circumstances, see Joseph, 465 F.3d at 92, and

Gibson has also not produced any evidence in the record that could suggest that the length of time was in any way influenced by discrimination.

Finally, with regard to not being given notice of the charges against him immediately upon being placed on administrative leave, Gibson has provided no evidence to support his statement that "CSSD's own policy is to notify the accused of the charges against him or her immediately upon that person being placed on administrative leave,"[7] see Plf.'s Mem. in Opp. at 17, other than his conclusory assertion that, "[a]s a supervisor, I'm aware of the policies and the guidelines," see Plf.'s Stat. at Ex. 1, Gibson Dep. at 20.  The defendants claim that it was in accordance with requirements of confidentiality, see Def.'s Stat. at Ex. 20, "because in matters of workplace violence where you have a complainant who's come forward and indicated that she feels unsafe . . . to put this all in writing to the person while he is still there, it really can, in fact, create a more unsafe condition because we don't know whether the allegations are true, we don't know how the subject would react," see Plf.'s Stat. at Ex. 5, Carbone Dep. at 79-80.  Gibson compares himself to Marlene Tyson, and claims that she immediately received notice as to why she was being placed on administrative leave.[8]  See Plf.'s Stat. of Material Facts in Dispute at ¶ 14, Ex. 1, Gibson Dep. at 62-63.  However, Gibson provides no admissible evidence to support this comparison.  His deposition testimony, in which he stated that Tyson "received a document from

_____

[7]Although Gibson cites to a page from Eaddy's deposition that might support his assertion, see Plf.'s Stat. at ¶ 56, that particular page is not part of Gibson's exhibits nor is it part of the defendants' exhibits.  As such, the court cannot rely on this statement.

[8]Although Marlene Tyson is also African American, according to Gibson, he was treated differently in part because he was a black man.  See Plf.'s Stat. at Ex. 1, Gibson Dep. at 63.

administrative services and . . . CSSD juvenile services," id., does not appear to be based on personal knowledge.  Moreover, the defendants have provided evidence of a letter – similar to the one Gibson received – placing Tyson on administrative leave which does not indicate the reasons for doing so.  See Def.'s Stat. at Ex. 38C.  Thus, the court finds that Gibson has failed to create a genuine issue of material fact on this issue.

### 2.     Hostile Work Environment

To establish a Title VII claim of discriminatory harassment or hostile work environment, Gibson must show that he was subjected to harassment "sufficiently severe or pervasive to alter the conditions of [his] employment and create a hostile working environment," Harris v. Forklift Systems, 510 U.S. 17, 21 (1993), and that the harassing conduct occurred because of his race, Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (holding that Title VII "is directed only at "discriminat[ion] . . . because of . . . [a protected category]") (emphasis added); see also Jackson v. Health Resources of Rockville, Inc., 357 F. Supp. 2d 507, 519 (D. Conn. 2005) (stating that plaintiff must show defendant was "both objectively and subjectively hostile towards her for a discriminatory reason").

In order for the harassment of Gibson to be actionable, the harassing conduct must have been so severely "permeated with 'discriminatory intimidation, ridicule, and insult' . . . to alter the conditions of the victim's employment."  Harris, 510 U.S. at 21 (citations omitted).  The workplace must have been both objectively and subjectively hostile.

Conduct that is not severe or pervasive enough to create an objectively

13

hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Id. at 21-22.  In determining whether a workplace is hostile or abusive, the finder of fact must look to the totality of the circumstances of the workplace and the alleged harassment, circumstances which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. at 23.  "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)).

The defendants challenge Gibson's hostile environment claim both because it is based on discrete acts that are time-barred and because there is no evidence that the defendants were motivated by Gibson's race.  See Def.'s Memorandum in Support of Summary Judgment ("Mem. in Supp.") at 5.  Regarding the first argument, the defendants concede there was one statement that was allegedly made by O'Leary around February 1993, eleven years prior to Gibson's filing of his CHRO complaint, when Gibson overheard O'Leary referring to Gibson as "another dumb black jock."  See Plf.'s Stat. at Ex. 1, Gibson Dep. at 86.  However, this statement is too remote to support a hostile work environment claim.  See Diggs v. Town of Manchester, 303 F. Supp. 2d 163, 182 & n.11 (D. Conn. 2004) (explaining that, although not all acts constituting hostile environment need to fall within the statutory time period, "the fact

14

that many of the incidents occurred more than 15 years earlier is relevant to the weight to be given this evidence and whether these incidents were part of the same actionable hostile work environment practice") (citations omitted).

The defendants also argue that the fact that Gibson was placed on administrative leave and under investigation does not demonstrate that such actions were motivated by his race. <u>See</u> Def.'s Mem. in Opp. at 6. Gibson counters that his hostile environment claim is based on a series of acts, beginning with the moment when Gibson was "falsely accused of failing to follow a directive" and continuing until the time of his transfer to New Britain in June 2004. <u>See</u> Plf.'s Mem. in Opp. at 28-29. The evidence for this claim includes: Eaddy limited Gibson's (and Creacy's) job duties and power to implement policy and then "fabricated" his refusal to follow her directive and his threatening behavior; the defendants purposefully encouraged Eaddy to pursue her complaints against Gibson, which Eaddy later revealed to Gibson during a telephone conversation (which she denies); Roorbach confronted Gibson, while bypassing Creacy, in an intimidating manner while at the same time accusing Gibson of being intimidating; Gibson was not immediately notified of the reason he was placed on administrative leave; Gibson was publicly escorted from the premises when he was placed on leave; the investigation took too long (three months); Gibson's job duties were temporarily altered and he was subjected to certain conditions upon his return from work despite the investigation having found the allegations of workplace violence to be unsubstantiated; and the defendants' actions tarnished his "once sterling professional reputation and employment record." <u>See</u> Plf.'s Mem. in Opp. at 29-33.

However, these incidents of harassment do not, even if based on race, constitute

15

a violation of Title VII. Viewed objectively, the series of incidents Gibson describes did not create a work environment "severely permeated with discriminatory intimidation, ridicule, and insult." <u>Alfano</u>, 294 F.3d at 373. Title VII is not a "general civility code." <u>Oncale</u>, 523 U.S. at 80 (emphasizing that Title VII is not "a general civility code for the American workplace"). Most of Gibson's complaints "attack[] 'the ordinary tribulations of the workplace.'" <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998) (citations omitted). It is precisely this type of complaint that Title VII's "severe or pervasive" requirement is designed to "filter out." <u>Id.</u>

Thus, Gibson has not created a material issue of fact that harassment of him was sufficiently severe or pervasive to create an objectively hostile work environment pursuant to the high legal threshold governing such claims.

### 3. <u>Retaliation</u>

The defendants next challenge Gibson's contention that the defendants retaliated against him for protesting discrimination in an email he wrote to Carbone, Eaddy, and Roorbach, on November 17, 2003, regarding Gibson's alleged misconduct. A plaintiff makes a prima facie showing of retaliation by establishing "participation in a protected activity known to the defendant; an employment action disadvantaging the plaintiff; and a causal connection between the protected activity and the adverse employment action." <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 769 (2d Cir. 1998) (quoting <u>Tomka v. Seiler Corp</u>, 66 F.3d 1295, 1308 (2d Cir. 1995)).

Within the context of Title VII claims, a "'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 566 (2d Cir. 2000) (citing 42 U.S.C. § 2000e-3). Thus, the question turns

16

on whether the employee has protested an "unlawful employment practice" under Title VII.  See Wimmer v. Suffolk County Police Dep't., 176 F.3d 125, 135 (2d Cir. 1999). Gibson "need not establish that the conduct [he] opposed was actually a violation of Title VII, but only that [he] possessed a 'good faith, reasonable belief that the underlying employment practice was unlawful' under that statute."  Galdieri-Ambrosini v. Nat'l Realty and Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998) (citations omitted).  While informal protests of discrimination may constitute protected activity, see Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990), "'careless and uncounseled accusations of discrimination' are not necessarily protected."  Lapsley v. Columbia University-College of Physicians and Surgeons, 999 F. Supp. 506, 524 (S.D.N.Y. 1998) (citations omitted).  Indeed, although complaints about conduct clearly prohibited by Title VII "need not mention discrimination or use particular language, . . . ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity."  Int'l Healthcare Exchange, Inc., v. Global Healthcare Exchange, LLC, _ F. Supp. 2d _, 2007 WL 102123, at *7 (S.D.N.Y. 2007); see also Ramos v. City of New York, 1997 WL 410493, at *3 (S.D.N.Y. 1997) (stating that "[w]hile there are no magic words that must be used when complaining about a supervisor, in order to be protected activity the complainant must put the employer on notice that the complainant believes that discrimination is occurring").

Here, Gibson claims that his protected activity is an email he sent to Carbone, Eaddy, and Roorbach on November 17, 2003, prior to the pre-disciplinary hearing for his alleged refusal to follow Eaddy's directive, in which he expressed his desire to speak with Carbone regarding the incident.  See Plf.'s Stat. at Ex. K.  His stated

17

reasons for wishing to speak with Carbone included: his attempts to resolve the communication problems between him and Eaddy; false accusations against him; his meeting with Roorbach on October 2nd; his past performance evaluations, which he claims inaccurately evaluated his interpersonal skills; and the "bigger problem with communication and personal interpretations." Id. Gibson relies on the word "discriminatory," which he used twice in the paragraph discussing the October 2nd meeting with Roorbach, to argue that the defendants were placed on notice that he believed he was discriminated against.[9]

The court finds that this email is similar to the facts in Lapsley, where the court held that the plaintiff's "passing remark" to her supervisor that she was being "treated differently as opposed to other whites and Hispanic employees" was not to be construed as protected activity. 999 F. Supp. at 524. The court found that, "given the casual and vague nature of her remark to her supervisor, that she never articulated the basis for her belief of discrimination, and that 'there was no semblance of [race]-oriented motivation in the events' described by Lapsley," Lapsley had not established that she engaged in a protected activity. Id. at 525. In this case, the court finds that, even more clearly than in Lapsley, Gibson's use of the word "discriminatory," without

---

[9]Regarding this meeting, Gibson wrote in his email:

It was interesting to see [Roorbach's] highly confrontational and discriminatory approach to addressing alleged misconduct. He questioned me personally about such false accusations which I found to be discriminatory and that he indicated on 08/31/2003 he knew nothing about. I was not permitted to completely provide him with an explanation to the alleged misconduct given his approach and tactics, and the direction of our conversation. I have provided him with my response via an affidavit.

Id.

more, does not indicate that the email should be construed as protected activity, particularly given the context in which it was written, that is, the main purpose of the email was to complain, in the context of the pre-disciplinary hearing which was about to happen, about being falsely accused of failing to follow a directive. The use of "discriminatory," moreover, does not automatically put the defendants on notice of any discrimination based on a protected category, which is a critical requirement of a prima facie case of retaliation under Title VII. See Galdieri-Ambrosini, 136 F.3d at 292. "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Id. Without awareness by a decision-maker that the conduct complained of may have been discriminatory under Title VII, it would not be possible to find any causal connection between the protected activity and the adverse action. See id.

**B.     Section 1983 Action for Violation of Section 1981** (Count Two)

Gibson's complaint alleges that the individual defendants discriminated against him in violation of his rights under 42 U.S.C. § 1981, as enforced through 42 U.S.C. § 1983.[10]  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an

---

[10]Although the defendants also analyze Gibson's claims in Count Two of his Amended Complaint under the Due Process and Equal Protection Clauses of the Constitution, the court reads Gibson's Amended Complaint to allege only § 1981 statutory violations. Since Gibson has also not addressed any of the defendants' constitutional challenges in his opposition brief, the court will only consider Gibson's § 1983 claim as asserting a § 1981 claim.

action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  While section 1983 "'is not itself a source of substantive rights' . . .

[it] provides 'a method for vindicating federal rights elsewhere conferred,' such as those

conferred by § 1981."  Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004).

Section 1981 provides that "[a]ll persons within the jurisdiction of the United

States shall have the same right in every State and Territory to make and enforce

contracts . . . and to the full and equal benefit of all laws and proceedings for the

security of persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981.  To

state a claim under section 1981, a plaintiff must establish the following elements: "(1)

the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of

race by the defendant; and (3) the discrimination concerned one or more of the

activities enumerated in the statute . . . ."  Mian v. Donaldson, Lufkin & Jenrette

Securities Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).

Gibson's claims against Carbone "stem from the latter's decision to place the

former on administrative leave without proper notice."  See Plf.'s Mem. in Opp. at 39.

His claims against O'Leary stem from her being "responsible for the fabrication of facts"

surrounding the investigation into possible workplace violence, which was "based on a

discriminatory animus against him for being an intelligent and competent black man."

Id. at 39-40.  Gibson's claims against Roorbach stem from his allegedly false

accusations that Gibson was engaging in intimidating and threatening behavior, and

from his collaboration with O'Leary in "her plan to move plaintiff out of the New Haven

CSSD office."  Id. at 40.  Gibson supports these allegations with one paragraph which

adds a footnote requesting the court to incorporate by reference his Title VII arguments. See Plf.'s Mem. in Opp. at 40 & n.10.

The Second Circuit has explained that "[m]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981." Patterson, 375 F.3d at 225. Accordingly, for the same reasons that Gibson cannot prevail on his Title VII claims of intentional discrimination, he cannot prevail on his § 1981 claims.[11] See Lizardo v. Denny's, Inc., 270 F.3d 94, 106 n.6 (2d Cir. 2001).

### C.  Intentional Infliction of Emotional Distress (Count Three)

In order to maintain his claim for intentional infliction of emotional distress ("IIED") under Connecticut law, Gibson must show that: (1) the defendants intended to inflict emotional distress on him or knew, or should have known, that emotional distress was the likely result of their actions; (2) that the defendants' conduct was extreme and outrageous; (3) that the defendants' conduct is the cause of his emotional distress; and (4) that the emotional distress sustained is severe. See Appleton v. Bd. of Educ. of the Town of Stonington, 254 Conn. 205, 210 (2000). Whether the defendants' conduct was extreme and outrageous is the initial question for the court to address. See id. "Only where reasonable minds disagree does it become an issue for the jury." Id.

To be extreme and outrageous, the defendants' conduct must exceed "all bounds usually tolerated by decent society." See id. (quotation omitted). In fact,

> [l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible

---

[11]The court therefore need not address the defendants' qualified immunity defense.

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Id. (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d, 73 (1965)). The defendants assert that they did not engage in any extreme or outrageous conduct and that reasonable minds cannot disagree in this situation.

Connecticut courts have held that "insults, verbal taunts, threats, indignities, annoyances, petty oppressions, or conduct that displays bad manners or results in hurt feelings, do not support a claim for intentional infliction of emotional distress." Miner v. Town of Cheshire, 126 F. Supp. 2d 184, 195 (D. Conn. 2000) (citations omitted); see also Perodeau v. City of Hartford, 259 Conn. 729, 757 (2002) (stating that individuals in the workplace should expect to be subjected to workplace gossip, rivalry, personality conflicts, and the like). Furthermore, individuals in the workplace should expect to experience some level of emotional distress. Perodeau, 259 Conn. at 757. "There are few things more central to a person's life than a job, and the mere fact of being demoted or denied advancement may be extremely distressing." Id. However, the Perodeau Court would not allow persons in the workplace to be subject to conduct that "'transgresses the bounds of socially tolerable behavior,'" or that would involve "'an unreasonable risk of causing emotional distress . . . that . . . if it were caused, might result in bodily harm.'" Id. (citations omitted).

Gibson's allegations of extreme or outrageous conduct are based on the same facts as his allegations of disparate treatment, harassment, or retaliation. Thus, since Gibson's claim of IIED is directly based on his Title VII claims, the evidence is also

22

insufficient, for the reasons given above, to establish Gibson's IIED claim. <u>See Martin v. Citibank, N.A.</u>, 762 F.2d 212, 220 (2d Cir. 1985). Even if this were not the case, Gibson has not created a material issue of fact as to his IIED claim, as none of the acts alleged by Gibson satisfy the "stringent standard" required "to demonstrate that a defendant's conduct was 'extreme and outrageous.'" <u>Sangan v. Yale University</u>, 2006 WL 2682240, at *4 (D. Conn. 2006).

## IV.  CONCLUSION

Based on the foregoing analysis, the defendants' Motion for Summary Judgment **[Doc. No. 43]** is GRANTED. Because the court considered all the evidence in the record in making this Ruling, the defendants' Motion to Strike **[Doc. No. 54]** is DENIED as moot. The clerk is hereby directed to close the case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 25th day of April, 2007.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge